UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

ALLEN RAY LAMBERT,

                    Petitioner,                          Case No. 1:08-cv-153

v.                                                       Honorable Paul L. Maloney

SHIRLEE A. HARRY,

                    Respondent.
_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner was convicted in the Genesee County Circuit Court of premeditated first-degree murder, MICH. COMP. LAWS § 750.316(1)(a); and breaking and entering an occupied dwelling, MICH. COMP. LAWS § 750.110.[1] The trial court sentenced defendant, as a second habitual offender, MICH. COMP. LAWS § 769.10, to life in prison without parole for the murder conviction and imprisonment of 15 to 22-1/2 years for the breaking and entering conviction. In his *pro se* petition, Petitioner raises two grounds for relief. First, Petitioner claims that his due process rights were violated when the trial court permitted the admission of improper rebuttal testimony. Second, Petitioner claims that the trial court violated his due process rights by allowing the admission of gruesome photos from the crime scene and autopsy.

_____

[1] Petitioner also was convicted of first-degree felony murder, MICH. COMP. LAWS § 750.316(1)(b), but the Michigan Court of Appeals remanded his case for modification of the judgment of sentence to reflect a single conviction for first-degree murder.

Respondent has filed an answer to the petition (docket #13) stating that the grounds should be denied because they are have no merit.  Petitioner filed a reply to Respondent's answer (docket #31).  Upon review and applying the AEDPA standards, I find that Petitioner's claims are without merit.  Accordingly, I recommend that the petition be denied.

## Procedural History

### A.        Trial Court Proceedings

The state prosecution arose from the murder of Alma Malzahn on the night of September 6, 1993, in Flint, Michigan.  Petitioner and his co-defendant, Robert Bigelow, were charged with her murder.  Following a preliminary examination on January 1, 1994, Petitioner was bound over on a charge of open murder.  A supplemental information was filed charging petitioner as a habitual offender, second offense.  Petitioner and Bigelow were tried at the same time before separate juries beginning June 14, 1995, and concluding on June 22, 1995.  At trial, Petitioner admitted to causing the victim's death, but maintained that he did not intend to kill her.

Flint Police Officer Walter Kalberer testified that he was dispatched to 501 Pettibone on the morning of September 7, 1993.  (Tr. I, 34.)[2]  When he arrived, he was informed by first-responders that the victim was deceased.  (*Id.*)  The victim's body was in her bedroom, lying on the floor on the left side of the bed.  (Tr. I, 34-36.)  The victim's daughter told Kalberer that when she entered her mother's bedroom, the bedroom window and exterior door were open.  (Tr. I, 35.)  Kalberer maintained the crime scene until the homicide detectives arrived.  (Tr. I, 39.)

---

[2] The trial transcripts will be referred to as follows:
Tr. I  - Trial Transcript Volume I, June 15, 1995 (docket #41)
Tr. II  - Trial Transcript Volume II, June 16, 1995 (docket #42)
Tr. III - Trial Transcript Volume III, June 20, 1995 (docket #43)
Tr. IV - Trial Transcript Volume IV, June 21, 1995 (docket #44)
Tr. V - Trial Transcript Volume V, June 22, 1995 (docket #25)

Flint Police Sergeant Charlie Weston testified that, when he arrived at the scene, he observed a deceased elderly female laying face down on the floor next to the bed.  (Tr. I, 43.) Weston could see blood stains on the right side of her face.  (*Id.*)  Upon examining the room, Weston found a black purse sitting open on the sofa.   The purse was empty and appeared to have some blood and a white residue on the outside surface.  (*Id.*)  Weston also went outside to examine the exit areas of the house.  (*Id.*)  There was a wooden handicap ramp that led to a backdoor to the victim's bedroom.  Weston observed that the screen from the window next to the door had been removed and was sitting next to the ramp.  (Tr. I, 45.)  He also noted some white smudges on the rail area of the ramp.  (*Id.*).

Flint Police Sergeant Charles Middleton was assigned as one of the homicide detectives in this case.  (Tr. I, 48-49.)  Middleton observed that the victim had blood around her head and had several cuts and bruises on her body.  (Tr. I, 51, 66.)  Middleton examined the victim's bedroom, which contained a bed and a sitting area with a couch, chairs and television.  (Tr. I, 52.)  There was a black purse on the couch.  (*Id.*)  He found what appeared to be blood on the purse and on the windowsill of the window with the missing screen.  (Tr. I, 66.)  In addition, there was a Kleenex box laying on the floor about a foot from the victim's head that appeared to have droplets of blood on the top and side.  (Tr. I, 113-14.)  Middleton testified that the white powdery substance on the purse was the same color as the aluminum siding on the exterior of the house.  (Tr. I, 89, 103.)

Middleton examined the window with the missing screen and determined that a forced entry had been made.  (Tr. I, 52.)  He also observed other signs of criminal activity on the property. The screen on the window of the storage shed in the back yard was freshly cut and there were some marks that were consistent with an attempted forced entry.  (Tr. I, 83.)  In addition, the exterior

entrance door to the garage was ajar.  (Tr. I, 76.)  According to the occupants of the house, some items were missing from the two cars that were in the garage.  (Tr. I, 101-102.)  Police officers recovered a cassette tape carrier and cassette tapes along a fence line near the house.  (Tr. I, 55, 61, 78-79.)  Middleton testified that he attended the victim's autopsy.  (Tr. I, 94.)  A police technician photographed the body and collected evidence.  (Tr. I, 95-100.)

Leona Belle Roome testified that she lived at 501 Pettitbone with her sister, Myrtle Cole and her mother, Alma Malzahn.  (Tr. I, 119.)  Malzahn was ninety-seven years old at the time of her death.  (Tr. I, 120.)  On the morning of September 7, Roome thought her mother was up because the light was on in her bedroom.  (Tr. I, 124.)  When Roome entered her mother's bedroom, she found her on the bedroom floor.  (Tr. I, 122.)  Roome checked her pulse and could tell that she was deceased.  (*Id.*)  Roome saw the blood around her head, but assumed that she had fallen and hit her head or had hemorrhaged from a stroke.  (Tr. I, 123.)  She covered her mother with a robe and an afghan.  (Tr. I, 122.)  Roome noticed that her mother's purse was open and empty, but did not think too much of it at the time.  (Tr. I, 123.)  Roome notified her sister and her son of Malzahn's death and they called the funeral home.  (Tr. I, 122.)  When Roome's son arrived and looked at the victim, he called 911 because he believed that she had been murdered.  (Tr. I, 125.)  Roome testified that the backdoor to the bedroom was closed, but unlocked.  Roome had checked all of the doors the night before to ensure they were locked.  (*Id.*)

Roome testified that her mother usually carried a wallet, checkbook, make-up kit, diamond ring and wedding band in her purse.  (Tr. I, 128.)  She typically carried $400 to $600 in her wallet.  (*Id.*)  When Roome saw the purse on the morning of September 7, it was empty.  (Tr. I, 129.)  Roome testified there was a container with pens, pencils and a letter opener sitting on top of the desk

in her mother's room.  (Tr. I, 126, 142.)  Roome testified that on the night of the murder, there were two cars in the garage.  (Tr. I, 129.)  After the police left, Roome and her sister discovered that cassette tapes were missing from their cars.  (Tr. I, 130.)

Mark Roome, the victim's grandson, testified that he went to 501 Pettitbone after he received a call from his mother saying that his grandmother had died.  (Tr. II, 4-5.)  Mark suspected that his grandmother had been murdered when he saw blood on her face and the empty purse, and found the exterior door to her room unlocked.  (Tr. II, 6-7.)  He called 911 and reported his suspicion to the police.  (Tr. II, 7.)

Elise Ballance testified that she and Bigelow lived together at the time of the murder and had two children together.  (Tr. II, 10-11.)  Ballance also knew Petitioner because he lived next door to them.  (Tr. II, 11, 15.)  Bigelow told her about the murder in September 1993, a few days after it had occurred. (Tr. II, 12.)  A couple of weeks later, Ballance overheard a conversation between Bigelow and Petitioner.  (*Id.*)  Bigelow told Petitioner that he told Ballance what happened, referring to the murder.  (Tr. II, 13.)  Petitioner responded that if Ballance told anyone, he would kill her.  (*Id.*)

Dr. Willys Mueller testified that he performed the autopsy on the victim, Alma Malzahn. (Tr. II, 26.)  At the time of her death, the victim was 97 years old, measured 5'1" weighed 80 to 85 pounds.  (Tr. II, 30.)  Dr. Mueller described the victim's external wounds as follows:

> On Mrs. Malzahn we had multiple abrasions about the forehead, over the nose and on the left side of the face from the ear all of the way to the front of the cheek.  There were abrasions over the right side of the face.  There was an abrasion underneath the chin.  There was [sic] the right eye was contused on the lateral aspects right over the bone.  If you feel the bone here was dark purple and the entire eye was blackened. There was bleeding into the eye and the conjunctiva.  The right corner of the mouth had bruising and bluish discoloration.  Another contusion around the corner of the right side of the mouth.  In the right neck there were two stab wounds that were five millimeters or about a quarter of an inch below the ear lobe and one was- -they were

vertical and one was here, it was about an inch wide and when [sic] then up underneath the mandible or the jaw bone into the soft tissue for about three sonometers [sic] or about an inch and a quarter with all going in under.  Behind it was another vertical wound which then went up and under again about an inch into the soft tissue of the neck and it measured an inch.  And there was extensive bleeding into the tissue around those stab wounds.  Down lower in the neck right about where you can feel your muscle there were two linear superficial wounds that looked like fingernail scrapes.  They were here and they were right about in this area and they measured, they only went into the skin very superficially.  On the back of the neck there was a third stab wound or a puncture wound which measured eight by three millimeters and that went deep into the soft tissue of the neck.  And then in the right shoulder one inch to the right of the mid-line in the back just below the base of the neck there was another incised wound and a fifth incised wound one inch further out to the side of that first wound which also went into the soft tissue.  There was bruising all over the top of the right shoulder with a lot of bleeding over the top of the right shoulder.  There was an abrasion over the side of the right hip and there were two incised wounds over the back of each forearm.  These were superficial and sort of went tangentially underneath the skin, but not all of the way into the soft tissue and there was extensive bleeding associated with those.

(Tr. II, 27-29.)  Dr. Muller testified that the three puncture wounds in the victim's neck would have been made with a long circular tool, such as a ball point pen.  (Tr. II, 32-34, 50.)  The two longer, incised wounds appeared to be made by a knife or other sharp metallic object.  (Tr. II, 33-34, 50.)

Dr. Mueller's internal examination revealed extensive hemorrhage into the soft tissue of the neck and the outside coverage of the carotid artery, which was consistent with compression.  (Tr. II, 42, 57.)  In addition, the victim had a large hemorrhage into the scalp on the left side of the head.  (Tr. II, 43.)  The hemorrhage went into the brain and caused bleeding within the brain fluids.  (*Id.*)  The victim also had a fractured neck that resulted in injury to the spinal cord.  (Tr. II, 43-44.)  Dr. Mueller concluded that the cause of death was manual strangulation with extensive hemorrhage into the neck and C7-T1 fracture with injury to the cord.  (Tr. II, 44-45.)  He opined that without the strangulation, the victim's other injuries were not fatal.  (Tr. II, 45.)  The extent of the bleeding indicated that the wounds were inflicted before the strangulation.  (Tr. II, 46-47.)  Dr. Mueller

testified that the victim could have lost consciousness from the blow to her head that caused the hemorrhage or from the strangulation. (Tr. II, 47.)

Flint Police Detective Thomas Korabik testified that he was the officer in charge of this case. (Tr. II, 67.) As a result of information received from Elise Ballance and others, Korabik interviewed Petitioner at the police station on December 14, 1994. Detective Gary Elford also was present at the interview. Petitioner agreed to waive his *Miranda* rights and talk to Korabik. (Tr. II, 69-71.) Petitioner told Korabik that he and Robert Bigelow had been drinking together in September 1993, when they decided to go into a garage at a house and went through the cars. Petitioner took cassettes from the cars. They proceeded to look around the outside house and found a window that was not locked. They opened the window and went into the house. (Tr. II, 76-77.) Petitioner saw a woman sitting up in bed. He hid behind a chair, but she got up and looked at him. He said to her, "Don't say anything. I won't kill you." Petitioner told Korabik that he put the woman in a "sleeper hold" and thought that she would go to sleep. (Tr. II, 78.) Petitioner stated that he grabbed a metal piece and stabbed her in the eye. Then he gave it to Bigelow and he stabbed her. They grabbed a small black purse[3] and went out the door of the house. (Tr. II, 79.) There was about $200 in the purse. The two men threw the purse, a knife and their coats into a creek. (Tr. II, 80.)

Thomas Guest testified that he became Petitioner's step-father when Petitioner was six months old. (Tr. III, 29.) When Petitioner and his twin sister were born, Petitioner had the umbilical cord wrapped around his neck. (Tr. III, 30.) Guest believed that the birth trauma caused Petitioner to be mentally retarded. Petitioner attended special education classes until seventh grade and then stopped attending school. He was sixteen years old at that time. (*Id.*) Petitioner was disruptive in

---

[3] It appears that the small black purse referred to by Petitioner was the victim's wallet.

school and did dangerous things as a teenager without realizing that he was placing himself and others in danger.  (Tr. III, 31-33.)  As an adult, Petitioner lived on his own and worked a paper route, although he was not employed in September 1993.  (Tr. III, 36-39.)

Dr. Thomas Shazer testified that he was a clinical psychologist employed at the Center of Forensic Psychiatry in Ann Arbor.  (Tr. III, 42-45.)  Shazer evaluated Petitioner in March 1995. (Tr. III, 46.)  Shazer relied upon a 1984 IQ test that reflected a score of 52, which falls within the moderate range of mental retardation.  (Tr. III, 47-48.)  Based upon Shazer's interaction with Petitioner, he believed the score to be accurate.  (Tr. III, 47-49.)  Shazer did not believe that the level of Petitioner's mental retardation would prevent him from anticipating the consequences of his actions or from making moral judgments.  (Tr. III, 54, 68.)  Shazer did not find that Petitioner suffered from any mental illness.  (Tr. III, 59.)  Petitioner claimed to have had hallucinations, but Shazer discredited that assertion after Petitioner claimed to have false psychotic symptoms suggested by Shazer.  (Tr. III, 59-60.)  While Petitioner had impairments in his ability to function in everyday life compared to most people, he was able to live on his own.  (Tr. III, 61-63.)  In discussing this case, Petitioner told Shazer that he went into the house to steal something.  (Tr. III, 65.)  He also told Shazer that he decided to approach the victim after she saw him because he did not want her to call the police.  (Tr. III, 64.)  Shazer agreed that Petitioner engaged in deliberate acts and that he was intellectually capable of deciding to take those actions.  (Tr. III, 65.)  On the subject of whether it was right or wrong to kill somebody else, Petitioner stated that it was only right if you had a good reason.  (Tr. III, 74.)  When Shazer asked Petitioner if he had a good reason to kill the victim in this case, he did not give a direct response, but stated, "I wish I wouldn't have did it now."  (Tr. III, 75.)

Petitioner testified that he went to school until the seventh grade.  (Tr. III, 84.)  He repeated seventh grade three times, but was unable to pass.  (*Id*.)  Petitioner was about fifteen years old when he stopped attending school.  (Tr. III, 85.)  When Petitioner was seventeen or eighteen years old, a friend of Petitioner's brother, Tom Peterson, put him in a hold that caused him to go to sleep.  (Tr. III, 85-86.)  Petitioner described that he took ten deep breaths and put his fists under his chin.  (Tr. III, 86.)  Peterson then put his arms around Petitioner's chest from behind and squeezed him five times.  (Tr. III, 87.)  Petitioner does not know how long he was asleep, but felt fine when he woke up.  (*Id*.)  On another occasion, Petitioner's brother put his arm around Petitioner's neck and squeezed until Petitioner fell asleep.  (Tr. III, 88.)  Again, Petitioner felt fine after he regained consciousness.  (Tr. III, 88-89.)

In September 1993, Petitioner was living in an apartment.  Before that, he lived with his parents on Tobias street.  (Tr. III, 89.)  Bigelow and Ballance were their neighbors on Tobias street.  (Tr. III, 89-90.)  On the night of September 6, 1993, Petitioner and Bigelow had some drinks at Ray's Bar.  (Tr. III, 90.)  On the way home, Petitioner suggested that they go "car hopping," which he described as "[l]ooking and taking stuff."  (Tr. III, 91-92; Tr. IV 6.)  They went into a garage at 501 Pettitbone and Petitioner took a brown case containing cassette tapes from one of the cars in the garage.  (Tr. III, 92.)  After that, they walked by the back door and used a screwdriver from one of the cars in the garage to remove a window screen.  (Tr. III, 92-93.)  They opened the window, which was unlocked, and entered the house.  (Tr. III, 96.)  Petitioner went in first and waited for Bigelow.  (Tr. III, 96, 101-02.)  A woman sleeping in the room woke up and turned on the light.  (Tr. III, 96.)  Petitioner tried to hide behind a chair, but the woman saw him.  (Tr. III, 97.)  Petitioner decided that he had to do something before the woman called the police.  (Tr. IV, 8.)  He went up behind the

- 9 -

woman and "told her if she didn't say nothing I won't kill her." (Tr. III, 98; Tr. IV, 8.) Petitioner initially put both of his hands around her neck and squeezed hard. He then changed his position to a sleeper hold with his arm around her neck like his bother had used on him and squeezed as hard as he could. (Tr. III, 98; Tr. IV, 8-9.) Petitioner intended to put the woman to sleep so he could escape. (Tr. III, 99-100.) He did not think that his actions could cause her serious injury. (Tr. III, 101.) After about a minute of squeezing her neck, the woman went down like she was going to sleep. (Tr. III, 100.) Petitioner put her down and ran out of the house through the back door. (Tr. III, 100, 102.) While Petitioner was holding her neck, Bigelow was stabbing her with a pencil or a pen. (Tr. III, 100; Tr. IV, 4.) Bigelow followed him out of the house about ten seconds later. (Tr. III, 104.)

After he left the house, Petitioner testified that he retrieved the vinyl cassette tape case from the porch and headed home on foot. (Tr. III, 103-04.) He left the cassette tape case in the grass by a fence. (Tr. III, 104.) Petitioner burned his coat later that night because it had blood in it. (Tr. III, 105.) According to Petitioner, they threw the purse by the creek, but he denied any knowledge of a knife. (Tr. IV, 16.) Petitioner claimed that he did not get any money from the robbery. (Tr. IV, 14.) Petitioner admitted that Bigelow told him that Ballance knew about the murder, but denied that he (Petitioner) threatened to kill her if she told anyone. (Tr. III, 107-08.) Petitioner maintained that he did not stab the victim and denied telling the police that he stabbed her. (Tr. III, 110; Tr. IV, 15.) Petitioner admitted that he caused the victim's death, but claimed that he did not intend for her to die. (Tr. IV, 19-21.)

Over the objection of defense counsel, Detective Korabik testified on rebuttal that during his interview with police, Petitioner stated "we grabbed the purse." (Tr. IV, 22.) According to

Korabik, Petitioner also stated that he stabbed the victim by the eye, that he received $200 from the burglary, and that they threw a knife away by the creek. (Tr. IV, 24-25.)

Gary Elford, the second detective present at the interview with Petitioner, also testified briefly on rebuttal. (Tr. IV, 29.) According to Elford, Petitioner was a little nervous during the interview, but was very matter of fact in describing what had occurred. (Tr. IV, 29-30.) Elford confirmed that Petitioner stated during the interview that he stabbed the victim in the right eye, that he and Bigelow took her purse, that he got $200 and that they threw some items by a creek. (Tr. IV, 30.)

At the conclusion of the trial on June 22, 1995, the jury found Petitioner guilty of premeditated first-degree murder, first-degree felony murder and breaking and entering an occupied dwelling. (Tr. V, 8-10.) On July 26, 1995, the trial court sentenced defendant, as a second habitual offender, to life in prison without parole for each of the murder convictions and imprisonment of 15 to 22-1/2 years for the breaking and entering conviction (Sentencing Transcript, 10, docket #27.)

B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by counsel on June 21, 2006, raised the same two issues as raised in this application for habeas corpus relief. Petitioner also raised a third claim- - that his conviction for first-degree premeditated murder and first-degree felony murder, arising from the death of the same victim, violated his right against double jeopardy. (*See* Def.-Appellant's Br. on Appeal, docket #28.) By unpublished opinion issued on April 10, 2007, the Michigan Court of Appeals affirmed Petitioner's convictions, but remanded the case to the trial court to modify the judgment of sentence to reflect a single conviction of first-degree murder support by two theories: premeditation murder and felony murder. (*See* 4/10/07 Mich. Ct. App. Opinion (MCOA Op.), docket #28.)

- 11 -

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court. Petitioner raised the same two claims presented in his habeas petition.  By order entered April 10, 2007, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (*See* Mich. Ord., docket #29.)

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  "Yet, while the principles of 'clearly established law' are to be determined solely by

resort to Supreme Court rulings, the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656.

This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

### I.    **Rebuttal Testimony**

In his first ground for habeas corpus relief, Petitioner contends that his due process rights were violated when the trial court allowed the prosecutor to call Detectives Korabic and Elford as rebuttal witnesses.  On rebuttal, Korabik and Elford testified regarding Petitioner's statement to police, which contradicted Petitioner's trial testimony in some respects.  Relying exclusively on state law, Petitioner contends that the rebuttal testimony should not have been admitted because it was proper only in the prosecutor's case-in-chief.  The Michigan Court of Appeals found no error in the admission of the testimony, stating:

> Defendant next contends that the trial court abused its discretion when it admitted the rebuttal testimony of Detectives Korabik and Elford. Specifically, defendant claims that their rebuttal testimony was improper because the testimony was cumulative to evidence introduced in plaintiff's case-in-chief. We find no error. We review a trial court's decision to admit rebuttal evidence for an abuse of discretion. *People v Figgures*, 451 Mich 390, 398; 547 NW2d 673 (1996). The abuse of discretion standard acknowledges that there are circumstances in which there is no one correct outcome. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003). If the trial court's decision results in an outcome within the range of principled outcomes, it has not abused its discretion. *Id.*
>
> Rebuttal evidence is admissible to explain, contradict, or otherwise refute an opponent's evidence. *Figgures*, *supra* at 399. A party may not introduce evidence during rebuttal unless it is properly responsive to evidence introduced or a theory developed by the opponent. *Id.*; *People v Pesquera*, 244 Mich App 305, 314; 625 NW2d 407 (2001). If evidence is responsive, it is proper rebuttal even if it overlaps evidence admitted in the case-in-chief. *Figgures*, *supra* at 399; *Pesquera*, *supra* at 314.

- 14 -

We find that, although the detectives' testimony overlapped evidence introduced in plaintiff's case-in-chief, the testimony was properly responsive to defendant's testimony. In the prosecution's case-in-chief, one of the detectives read the transcript of defendant's statement to the jury. During his testimony, defendant challenged the accuracy of the transcript and denied receiving money after the murder, seeing a knife, stabbing the victim, or telling the police that he stabbed the victim. On rebuttal, the detectives refuted this testimony with evidence of defendant's admissions during the December 1994 interview. By testifying from their personal recollections of the interview, the detectives undermined defendant's claim that the interview transcript was incorrect. Further, we note that the prosecutor did not artificially create an issue for rebuttal by eliciting denials from defendant so that he could present the rebuttal testimony. Reversal is not required.

(MCOA Op., 2.)

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552.

The admission of Detective Korabik and Elford's rebuttal testimony clearly did not deprive Petitioner of a fair trial. As the Michigan Court of Appeals explained, the challenged

testimony was offered to rebut Petitioner's assertion that the transcript of his police interview was inaccurate.  The rebuttal testimony was brief and narrowly focused on the inconsistencies between Petitioner's trial testimony and his statement to police.  Moreover, there was nothing new or unexpected in the detectives' rebuttal testimony that unfairly prejudiced Petitioner.  The mere fact that the rebuttal testimony was cumulative of Detective Korabik's previous testimony regarding Petitioner's statement in the prosecutor's case-in-chief falls far short of a due process violation, particularly given the focused nature of the rebuttal testimony.  Petitioner, therefore, is not entitled to habeas corpus relief.

II.    **Photographs**

Petitioner claims that his due process rights were violated by the admission of gruesome photos of the victim.  At trial, Sergeant Middleton introduced approximately eleven photos of the victim at the crime scene and from the autopsy.  (Tr. I, 89-99.)  Dr. Meuller also discussed the autopsy photos during his testimony.  (Tr. II, 30-39.)  In his supporting brief, Petitioner maintains that the photographs had no probative value because he was willing to stipulate to the location and nature of the victim's injuries.  He further argues that the stab wounds were inflicted by Bigelow, and, thus were not relevant to his guilt or innocence.  In rejecting Petitioner's claim on appeal, the Michigan Court of Appeals stated:

> Generally, all relevant evidence is admissible. MRE 402; *People v Crawford*, 458 Mich 376, 388; 582 NW2d 785 (1998). Even if relevant, however, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or needless presentation of cumulative evidence. MRE 403; *People v Sabin (After Remand)*, 463 Mich 43, 58; 614 NW2d 888 (2000).

> We find no merit to defendant's argument that the photographs lacked relevancy. Evidence is relevant if it has a tendency to make the existence of

- 16 -

a fact of consequence more or less probable. MRE 401; *Crawford*, *supra* at 388. The crime of first-degree premeditated murder requires proof that the perpetrator intentionally murdered the victim with premeditation and deliberation. MCL 750.316; *People v Saunders*, 189 Mich App 494, 496; 473 NW2d 755 (1991). Although the victim ultimately died as a result of manual strangulation, evidence that the perpetrator wounded her in a number of ways, including by stabbing her several times in the neck, is relevant to the question of intent. *See People v Mills*, 450 Mich 61, 71; 537 NW2d 909 (1995), mod 450 Mich 1212 (1995). The amount of blood on and around the victim's body indicated that she suffered numerous "torture" wounds before being strangled and was, therefore, relevant to show premeditation and deliberation.

Further, we disagree that the photographs were unfairly prejudicial because of their gruesome nature. "Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury." *People v Ortiz*, 249 Mich App 297, 306; 642 NW2d 417 (2001). While admitting gruesome photographs for the purpose of arousing the sympathies or prejudices of the jury is improper, such photographs are not rendered inadmissible merely because they vividly depict a gruesome or shocking crime. *Mills*, *supra* at 76-77. Here, although the photographs were gruesome, they accurately depicted a brutal murder and were highly probative because they were relevant to issues of consequence at trial. Therefore, we conclude that the probative value of the evidence substantially outweighed the danger of unfair prejudice.

Defendant additionally argues that the photographs were needlessly cumulative. While it is true that several witnesses testified about the scene of the crime and the victim's injuries, photographs are not excludable merely because a witness can orally testify about the information contained in them. *Id*. at 76. Photographs may be used to corroborate testimony. *Id*. The photographs at issue complemented testimony about the number and types of wounds inflicted on the victim, as well as the amount of blood on and around her body.

(MCOA Op., 3.)

After reviewing the photographs, I find that Petitioner was not denied a fundamentally fair trial by their admission. The Sixth Circuit repeatedly has held that the introduction of gruesome photographs of a victim's corpse in a murder case does not offend the Constitution when there is some legitimate evidentiary purpose for demonstrating the nature of the injuries. *See, e.g., Biros v.*

- 17 -

*Bagley*, 422 F.3d 379, 391 (6th Cir. 2005) ("The [state] court found, however, that the photographs were properly admitted as they demonstrated that Biros beat Engstrom rather severely and meticulously dissected her body with two different knives."); *Frazier v. Huffman*, 343 F.3d 780, 789 (6th Cir. 2003) ("The Ohio Supreme Court directly addressed this evidentiary issue, concluding that the multiple photographs 'were introduced during the coroner's testimony to illustrate the testimony,' that '[e]ach photograph presents a different perspective of the victim,' and that the photographs 'were used to illustrate' the nature of the encounter that immediately preceded Skiba's death.") (citation omitted); *Cooey v. Coyle*, 289 F.3d 882, 893 (6th Cir. 2002) (observing that "although the photographs were gruesome, they were highly probative").  The photographs were relevant to illustrating trial testimony regarding the victim's injuries.  The nature of the victim's injuries was particularly relevant in this case in light of the defense theory that the victim's death was unintentional.  Moreover, the photographs in this case were less inflammatory than in *Biros*, where the Sixth Circuit upheld the admission of photographs depicting a victim's severed head, severed breast, and severed body parts placed near the victim's torso.  *See Biros*, 422 F.2d at 391.  Accordingly, Petitioner cannot establish a due process violation arising from admission of the photographs.

## **Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Date:  June 25, 2009                          /s/ Ellen S. Carmody_____
                                             ELLEN S. CARMODY
                                             United States Magistrate Judge

- 18 -

## **NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).